UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DUNSINK TRADING, LTD.,

                                    Plaintiff,

            vs.

LINFORD SHIPPINGS LTD.,

                                    Defendant.

Civ. No.  *08 civ 5013 (GBD)*

## DECLARATION OF ANTHONY B. ULLMAN PURSUANT TO RULE B(1)

ANTHONY B. ULLMAN declares as follows:

1.      I am a partner of Salans, counsel for Plaintiff Dunsink Trading, Ltd. ("Dunsink").

2.      This declaration is submitted pursuant to Supplemental Rule B of the Federal Rules of Civil Procedure.

3.      On May 27, 2008, I caused an investigation to be made, under my direction, by a paralegal employed by my firm, as to whether the defendant, Linford Shippings Ltd. can be "found" within this District for the purpose of an attachment under Rule B.  This investigation indicates that it cannot.   The parameters and scope of the investigation were as follows:

(a)      The office of the New York Department of State, Division of Corporations, was contacted, through the official Department of State website at http://www.dos.state.ny.us and a search was conducted for a company named "Linford Shippings Ltd."  The search result indicated that Linford Shippings Ltd. is not a New York corporation and it is not licensed, authorized or registered to do business in the State of New York as either a domestic or foreign corporation;

(b)     Directory Assistance for New York for area codes (212), (718), (917), (646) and (914) was contacted.  No listing for Linford Shippings Ltd. was found;

(c)     Through Microsoft Internet Explorer, the Internet yellow and white pages telephone directory databases  www.yellowpages.com and www.whitepages.com were accessed.  On each of those databases, a search was conducted for a listing of Linford Shippings Ltd. in New York.  The search did not uncover any such listing;

(d)     Using the Google search engine, a website at www.linfordshipping.com was located.  The website did not indicate whether it is or was owned by Linford Shippings Ltd.  In any event, the website did not list any offices, locations or other information for Linford Shippings Ltd., or for any other company.

4.  Attached hereto is a copy of the Verified Complaint in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 30th day of May 2008.

_____
Anthony B. Ullman

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT COURT OF NEW YORK

---

DUNSINK TRADING, LTD.,

Petitioner,

-against-

LINFORD SHIPPINGS LTD.,

Respondent.

---

Case No.:

'08 CIV 5013

**VERIFIED COMPLAINT**

RECEIVED
MAY 3 0 2008
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, Dunsink Trading, Ltd. ("Dunsink"), by and through its attorneys Palans, respectfully alleges, as and for its Verified Complaint against Defendant, Linford Shippings Ltd. ("Linford"), as follows:

        1.    The claims set forth herein are admiralty and maritime claims within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure Court  for purposes of the Supplemental Rules for Certain Admiralty/Maritime Claims (the "Supplemental Rules").  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1333, in that it involves a claim for breach of a maritime time-charter contract, and an arbitral award resulting from said breach rendered in favor of Dunsink by an arbitral tribunal established under the rules and procedures of the Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation (Moscow), on or about December 26, 2007 (the "Award"). This Court also has jurisdiction  pursuant to 9 U.S.C. § 201, et seq., and 28 U.S.C. § 1331, in that Dunsink seeks confirmation and enforcement of the Award, which is a foreign arbitral award subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") and its implementing legislation, 9 U.S.C. §§ 201 ff.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT COURT OF NEW YORK

| | |
|---|---|
| DUNSINK TRADING, LTD., | Case No.: 08 civ 5013 (GBD) |
| Petitioner, | |
| -against- | **VERIFIED COMPLAINT** |
| LINFORD SHIPPINGS LTD., | |
| Respondent. | |

Plaintiff, Dunsink Trading, Ltd. ("Dunsink"), by and through its attorneys, Salans,

respectfully alleges, as and for its Verified Complaint against Defendant, Linford Shippings Ltd.

("Linford"), as follows:

1.       The claims set forth herein are admiralty and maritime claims within the

meaning of Rule 9(h) of the Federal Rules of Civil Procedure Court  for purposes of the

Supplemental Rules for Certain Admiralty/Maritime Claims (the "Supplemental Rules").  This

Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1333, in that

it involves a claim for breach of a maritime time-charter contract, and an arbitral award resulting

from said breach rendered in favor of Dunsink by an arbitral tribunal established under the rules

and procedures of the Maritime Arbitration Commission at the Chamber of Commerce and

Industry of the Russian Federation (Moscow), on or about December 26, 2007 (the "Award").

This Court also has jurisdiction  pursuant to 9 U.S.C. § 201, et seq., and 28 U.S.C. § 1331, in that

Dunsink seeks confirmation and enforcement of the Award, which is a foreign arbitral award

subject to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the

"New York Convention") and its implementing legislation, 9 U.S.C. §§ 201 ff.

2.     Plaintiff Dunsink is, and at all times relevant to this action was, a limited liability company organized under the laws of the British Virgin Islands.

3.     Upon information and belief, defendant Linford is, and at all times relevant to this action was, a company organized under the laws of the British Virgin Islands.

4.     In September 2006, Dunsink (as disponent shipowner) and Linford (as charterer) entered into a written maritime time-charter with respect to the vessel MV VOSKHOD (the "Contract"). A true and correct copy of the Contract is attached as Exhibit A hereto.

5.     After the Contract was executed, Linford breached its obligations under said time-charter contract by failing to pay, to Dunsink, amounts that were due and owing thereunder. On or about July 18, 2006, Dunsink, in accordance with the arbitration clause contained in Clause 42 of the Contract, submitted a request for arbitration to the Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation (Moscow) (the "MAC").

6.     An arbitral tribunal was thereafter duly constituted in Moscow.

7.     The arbitral tribunal issued its final award on or about December 26, 2007 (the "Award"). In the Award, the arbitral tribunal determined that Linford breached its obligations under the Contract and awarded Dunsink the total amount of $24,540.33. A certified copy of the Award, along with a certified translation thereof, is attached as Exhibit B hereto.

8.     Despite requests, Linford to date has failed to pay Dunsink any portion of the amount awarded to Dunsink under the Award.

9.     Defendant Linford cannot be found within this District within the meaning of Rule B of the Supplemental Rules but, upon information and belief, has, or will have during the pendency of this action, property within this District and subject to the jurisdiction of this

-2-

Court consisting of, <u>inter alia</u>, cash, funds, credits, wire transfers, electronic funds transfers,

accounts, monies, debts, and/or letters of credits belong to, due to or for the benefit of defendant

Linford, held in the hands of garnishees including, but not limited to, American Express Bank,

HSBC Bank USA, Bank of New York Mellon, Barclays Bank PLC, Credit Suisse First Boston,

ABN Amro Bank N.V., BNP Paribas, Deutsche Bank Trust Co. Americas, Deutsche Bank AG,

Citibank, N.A., JP Morgan Chase Bank, N.A., Wachovia Bank, Bank of America, N.A., or other

banks or garnishees whose identities may subsequently become known to plaintiff or plaintiff's

counsel.

      10.    Pursuant to Rule B of the Supplemental Rules, Dunsink is entitled to

attachment of said property, for the purpose of securing personal jurisdiction over Linford and to

secure Dunsink's claims.

      11.    The total amount to be attached at this time is $31,040.33, comprising the

following components:

      (a) final arbitration award in the amount of $24,540.33;

      (b) estimated interest on said award, from December 26, 2007 to date of entry of

judgment thereon (<u>see</u> Second Claim for Relief) in the amount of $2,000; and

      (c) estimated attorneys fees and expenses incurred in connection with this action

in the amount of $4,500.

      12.    The Award falls under the New York Convention pursuant to 9 U.S.C.

§ 202, in that it was made in the territory of the Russian Federation, arises out of a commercial

legal relationship and is not entirely between citizens of the United States.

-3-

13.     Pursuant to 9 U.S.C. § 207, Dunsink is entitled to confirmation of the Award, in that this petition is timely made and no cognizable grounds for refusing recognition or enforcement of the Award exist.

14.     Under the controlling Federal law, Dunsink is entitled to prejudgment interest, calculated at an appropriate rate, on the Award amount.

15.     Under both Federal law and the Contract, Dunsink is entitled to its attorneys fees and costs incurred in connection with this action.

WHEREFORE, plaintiff Dunsink respectfully prays:

A. That process in due form of law according to the practice of this Court issue against defendant Linford, citing it to appear and answer under oath all and singular the matters alleged in the Verified Complaint;

B. That, since defendant Linford cannot be found in this District within the meaning of Rule B of the Supplemental Rules, this Court issue an Order directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules, attaching all cash, accounts, credits, letters of credit, debts, monies, wire transfers and electronic funds transfers, tangible or intangible, or any other funds held by any garnishee, including but not limited to American Express Bank, HSBC Bank USA, Bank of New York Mellon, Barclays Bank PLC, Credit Suisse First Boston, ABN Amro Bank N.V., BNP Paribas, Deutsche Bank Trust Co. Americas, Deutsche Bank AG, Citibank, N.A., JP Morgan Chase Bank, N.A., Wachovia Bank and/or Bank of America, N.A., which belong to, or are due and owing to, Linford, in the amount of $31,040.33 calculated to date to secure Dunsink's claims, and that all persons claiming any interest in the same be cited to appear and, pursuant to Rule B of the Supplemental Rules, answer the matters alleged in the Verified Complaint;

-4-

C.  That this Court, pursuant to the New York Convention and 9 U.S.C. § 207, enter an Order (1) confirming the Award and granting judgment in favor of Dunsink against Linford in the amount of $24,540.33 and (2) awarding Dunsink prejudgment interest from December 26, 2007 through the date of entry of judgment at the rate of 9.0% on the above-stated amount;

D.  That this Court award Dunsink its costs, including attorneys' fees, in this proceeding;

E.  That this Court retain jurisdiction over this matter through the entry of any judgment or award associated with any of the claims set forth herein, or which mat be initiated in the future, including any appeals thereof; and

F.  That this Court grant Dunsink such other and further relief as the Court may deem just and proper.

Dated: New York, New York
      May 30, 2008

SALANS

By:  _____
      Anthony B. Ullman
      Rockefeller Center
      620 Fifth Avenue
      New York, New York 10020
      212-632-5500
      Attorneys for Dunsink Trading, Ltd.

-5-

## VERIFICATION

KONSTANTIN PURIM declares as follows:

1.    I am a Director of Dunsink Trading, Ltd., the plaintiff herein.

2.    I have read the foregoing Verified Complaint and know the contents thereof, and believe the same to be true and accurate to the best of my knowledge, information and belief.

3.    Concerning, in particular, Paragraph 9 of the foregoing Verified Complaint, to the best of my knowledge, information and belief, the defendant Linford Shippings Ltd. is not found within the Southern District of New York, in that it is a British Virgin Islands company and does not have any offices, personnel or representatives in New York.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 29 th day of May, 2008.

_____
Konstantin Purim

UNIFORM TIME-CHARTER (Box Layout 1974)

| | |
|---|---|
| | 2. Place and date , **Moscow September 06th 2006** |
| 3. Owners / Place of business<br>**«DUNSINK TRADING Ltd»**<br>**Trident Chambers, P.O.Box 146, Road Town,**<br>**Tortola, British Virgin Islands**<br>**(as disponent shipowner)** | 4. Charterers /Place of business<br>**LINFORD SHIPPINGS LTD.**<br>**P.O.Box 3321, Road Town, Tortola, British Virgin Islands** |
| 5. Vessel's name<br>**mv «VOSKHOD»** | 6. GRT / NRT<br>**2478 / 917** |
| 7. Class<br>**KM ⚙ L4 1 IISP,  Flag - Russia** | 8. Indicated horse power<br>**1280 kW** |
| 9. Total tons d.w. (abt.) on Board of Trade summer freeboard<br>**3135 MTS** | 10. Cubic feet grain/bale capacity<br>**4.297,58 m3** |
| 11. Permanent bunkers (abt.)<br>**motoroil 0,5-1,5 mts, dieseloil 60 mts** | |
| 12. Speed capability in knots (abt.) on a consumption in tons (abt.) of (at the moment of delivery of the Vessel):<br>**abt 8,0 knots on max 4,0 mts MDO p.d.** | |
| 13. Present position<br>**TRADING** | |
| 14. Period of hire (Cl. 1)<br>**6 months plus 6 further months at Charterers**<br>**option each period 15 days M.O.L. at Owners**<br>**option. Not later than 20 days before**<br>**expiration of first period of hire, the**<br>**Charterers should inform the Owners about**<br>**their option to prolong this charter or not.** | 15. Port of delivery (Cl. 1)<br>**Pilot Station Istambul Roads ATDNSHINC**<br>16. Time of delivery (Cl. 1)<br>**05/09/06 – 15/09/06** |
| 17. (a) Trade limits (Cl. 2)<br>    **See Add.Cl. 31** | |
| 18. Bunkers on re-delivery (state min. And max. quantity) (Cl. 5)<br>**Quantity of Bunkers on re-delivery to be same as on delivery min 40 mt. /max 70mt.** | |
| 19. Charter hire (Cl. 6)<br>**USD 2,350 (Two  thousand and three hundred**<br>**fifty US Dollars) net per day,**<br>**pro rata incl. O/T,  payable every 30 days in**<br>**advance.** | 20. Hire payment (state currency, method and place of payment; also beneficiary and bank account) (Cl. 6)<br>**US Dollars (See clause 29)** |
| 21. Place or range of re-delivery<br>**Dropping outward last seaport pilot (or if no**<br>**pilot taken adequate distance) 1 safe port**<br>**Azov/ Black sea/Marmara in Charterers**<br>**option** | 22. War (only to be filled in if Section (C) agreed) (Cl. 21) |
| 23. Cancelling date (Cl. 22)<br>**15th September 2006** | 24. Place of arbitration (only to be filled in if place other than London agreed) (Cl. 23)<br>**Clause 42** |
| | 25. Numbers of additional clauses covering special provisions, if agreed<br>**Cl.26 – Cl.45** |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

## PART II
## "BALTIME 1939" Uniform Time - Charter (Box Layout 1974)

It is agreed between the party mentioned in Box 3  1
as Owners of the Vessel named in Box 5 of the  2
gross/net Register tonnage indicated in Box 6,  3
classed as stated in Box 7 and of indicated horse  4
power as stated in Box 8, carrying about the  5
number of tons deadweight indicated in Box 9 on  6
Board of Trade summer freeboard inclusive of bun-  7
kers, stores, provisions and boiler water, having, as  8
per builder's plan a cubic-feet, grain/bale capacity  9
as stated in Box 10, exclusive of permanent bun-  10
kers which contain about the number of tons  11
stated in Box 11, and at delivery fully loaded capable of  12
steaming about the number of knots indicated in  13
Box 12 in good weather and smooth water on a  14
consumption of about the number of tons best  15
Welsh coal or oil-fuel stated in Box 12, now in  16
position as stated in Box 13 and the party men-  17
tioned as Charterers in Box 4, as follows:  18

1. **Period/Port of Delivery/Time of Delivery**  19
The Owners let, and the Charterers hire the Ves-  20
sel for a period of the number of calendar months  21
indicated in Box 14 from the time ~~(not a Sunday~~  22
~~or a legal Holiday unless taken over)~~ the Vessel  23
is delivered and placed at the disposal of the  24
Charterers ~~between 9 a.m. and 6 p.m., or between~~  25
~~a.m. and 2 p.m. if on Saturday,~~ at the port  26
stated in Box 15, in such available berth where  27
she can safely lie always afloat, as the charterers  28
may direct, she being in every way fitted for or-  29
dinary cargo service.  30
**The Owners should give to the Charterers 3 and 1**  
**days notice of delivery. The Vessel to be delivered**  31
**at the time indicated in Box 16.**  32

2. **Trade**  33
The Vessel to be employed in lawful trades for  34
the carriage of lawful merchandise only between  35
good and safe ports or places where she can  36
safely lie always afloat within the limits stated in  37
Box 17.  38
No live stock nor injurious, inflammable or dan-  39
gerous goods (such as acids, explosives, calcium  40
carbide, ferro silicon, naphtha, motor spirit, tar,  41
or any of their products) to be shipped.  42

3. **Owners to Provide**  43
The Owners to provide and pay for all provisions  44
and wages, for insurance of the Vessel, for all  45
deck and engine-room stores and maintain her in  46
a thoroughly effeciant state in hull and machinery  47
during service.  48
~~The Owners to provide one winchman per hatch.~~  49
~~If further winchmen are required, or if the steve-~~  50
~~dores refuse or are not permitted to work with~~  51
~~the Crew,~~ the Charterers to provide and pay  52
qualified shore-winchmen.  53

4. **Charterers to provide**  54
**Without limitations to the foregoing, the Charterers to**  55
provide and pay for all coals including galley coal, oil-fuel,  56
water for boilers,port charges, pilotages (whether  57
compulsory or not) canal steersmen, boatage, lights,  58
tug-assistance, consular charges (except those pertaining  59
to the Master, Officers and Crew), canal, dock and  60
other dues and charges, including any foreign  61
general municipality or state taxes, also all dock,  62
harbour and tonnage dues at the ports of de-  63
livery and re-delivery (unless incurred through  64
cargo carried before delivery or after re-delivery),  65
agencies, commisions, also to arrange and pay  66
for loading, trimming, stowing (including dunnage  67
and shifting boards excepting any already on  68
board), unloading, weighing, tallying and delivery  69
of cargoes, surveys on hatches, meals supplied to  70

officials and men in their service and all other  71
charges and expenses whatsoever including de-  72
tention and expenses through quarantine (includ-  73
ing cost of fumigation and disinfection).  74
All ropes, slings and special runners actually  75
used for loading and discharging and any special  76
gear, including special ropes, hawsers and chains  77
required by the custom of the port for mooring  78
to be for the Charterer's account. ~~The Vessel to~~  79
~~be fitted with winches, derricks, wheels and or-~~  80
~~dinary runners capable of handling lifts up to 2 tons.~~  81
 82

5. **Bunkers (see also clause 30)**  83
The Charterers at port of delivery and the Own-  84
ers at port of re-delivery to take over and pay  85
for all coal or oil-fuel remaining in the Vessel's  86
bunkers at current price at the respective ports.  87
The Vessel to be re-delivered with not less than  88
the number of tons and not exceeding the num-  89
ber of tons of coal or oil-fuel in the Vessel's  90
bunkers stated in Box 18.  91

6. **Hire**  92
The Charterers to pay as hire the rate stated in  93
Box 19, commencing in accordance  94
with Clause 1, until here to the Owners.  95
*Payment (see Rider clause 29)*  96
Payment of hire to be made ~~in cash,~~in the currency stated  97
in Box 20, without any discount **or deduction**, every  98
30 days, in advance, and in the manner prescribed  99
in Box 20 in default of payment the  100
Owners to have the right of withdrawing the Vessel from  101
the service of the Charterers, without noting any protest  102
and without interference by any court or any other  103
formality whatsoever and without prejudice to  104
any claim the Owners may otherwise have on the  105
Charterers under the Charter.  106

7. **Re-delivery**  108
The Vessel to be re-delivered on the expiration  109
of the charter in the same good order as when  110
delivered to the Charterers (fair wear and tear  111
excepted) at an ice-free port in the Charterers'  112
option at the place or within the range stated in  113
Box 21, ~~between 9 a.m. and 6 p.m. and 9 a.m.~~  114
~~and 2 p.m. on Saturday, but the day of re-delivery~~  115
~~shall not be a Sunday or legal Holiday.~~  116
~~Notice~~  117
The Charterers to give the Owners not less than ten  118
15/7/5/3/2 and 1 days' notice at which port and on  119
about which day the Vessel will be re-delivered.  120
Should the Vessel be ordered on a voyage by  121
which the Charter period will be exceeded the  122
Charterers to have the use of the Vessel to  123
enable them to complete the voyage, provided it  124
could be reasonably calculated that the voyage  125
would allow re-delivery about the time fixed for  126
the termination of the Charter, but for any time  127
exceeding the termination date the Charterers to  128
pay the market rate if higher than the rate stipu-  129
lated herein.  130

8. **Cargo Space**  131
The whole reach and burthen of the Vessel, in-  132
cluding lawful deck-capacity to be at the Char-  133
terers' disposal, reserving proper and sufficient  134
space for the Vessel's Master, Officers, Crew,  135
tackle, apparel, furniture, provisions and stores.  136

9. **Master**  137
The Master to prosecute all voyages with the ut-  138
most despatch and render customary assist-  139
ance with the Vessel's Crew. The Master to be  140
under the orders of the Charterers as regards  141
employment, agency, or other arrangements. The  142
Charterers to indemnify the Owners against all  143
consequences or liabilities arising from the Ma-  144




ster, Officers or Agents signing Bills of Lading 145
or other documents or otherwise complying with 146
such orders, as well as from any irregularity in 147
the Vessel's papers or for overcarrying goods. 148

The Owners not to be responsible for shortage, 149
mixture, marks, nor for number of pieces or 150
packages nor for damage to or claims on cargo 151
caused by bad stowage or otherwise 152
If the Charterers have reason to be dissatisfied 153
with the conduct of the Master, Officers or En- 154
gineers, the Owners, on receiving particulars or 155
the complaint, promptly to investigate the matter, 156
and if necessary and practicable, to make a 157
change in the appointments. 158

**10. Directions and Logs** 159
The Charterers to furnish the Master with all in- 160
structions and sailing directions and the Master 161
and Engineer to keep full and correct logs ac- 162
cessible to the Charterers or their Agents. 163

**11. Suspension of Hire, etc.** 164
(A) In the event of drydocking or other necessary 165
measures to maintain the efficiency of the Ves- 166
sel, deficiency of men or Owners' stores, break- 167
down of machinery, damage to hull or other ac- 168
cident (which take place on the Owners'
negligence), either hindering or preventing the work- 169
ing of the Vessel and continuing for more than 170
twenty four consecutive hours, no hire to be paid 171
in respect of any time lost thereby during the 172
period in which the Vessel is unable to perform 173
the service immediately required. Any hire paid 174
in advance to be adjusted accordingly. 175
(B) In the event of the Vessel being driven into 176
port or to anchorage through stress of weather, 177
trading to swallow harbours or to rivers or ports 178
with bars or suffering and accident to her cargo, 179
any detention of the Vessel and/or expenses re- 180
sulting from such detention to be for the Char- 181
terers' account even if such detention and/or ex- 182
penses, or the cause by reason of which either 183
is incurred, be due to, or be contributed to 184
by the negligence of the Owners' servants. 185

**12. Cleaning Boilers** 186
Cleaning Boilers whenever possible to be done 187
during service, but if impossible the Charterers 188
to give the Owners necessary time for cleaning 189
Should the Vessel be detained beyond 48 hours 190
hire to cease until again ready 191

**13. Responsibility and Exemption** 192
The Owners only to be responsible for delay in 193
delivery of the Vessel or for delay during the 194
currency of the Charter and for loss or damage 195
to goods onboard, if such delay or loss has been 196
caused by want of due diligence on the part of 197
the Owners or their Manager in making the Ves- 198
sel seaworthy and fitted for the voyage or any 199
other personal act or mission or default of the 200
Owners or their Manager. The Owners not to be 201
responsible in any other case nor for damage or 202
delay whatsoever and howsoever caused even if 203
caused by the neglect of default of their ser- 204
vants. The Owners not to be liable for loss or 205
damage arising or resulting from strikes, lock- 206
outs or stoppage or restraint of labour (including 207
the Master, Officers or Crew) whether partial or 208
general. 209
The Charterers to be responsible for loss or damage 210
caused to the Vessel or to the Owners by goods being 211

loaded contrary to the terms of the Charter or by 212
improper or careless bunkering or loading, stowing or 213
discharging of goods or any other improper or negligent 214
act on their part or that of their servants. 215
216

**14. Advances** 217
~~The Charterers or their Agents to advance to the~~ 218
~~Master, if required, necessary funds for ordinary~~ 219
~~disbursements for the Vessel's account at any~~ 220
~~port without any interest charging only interest at 6 per~~ 221
~~cent. p.a. such advances to be deducted from hire.~~ 222

**15. Excluded Ports** 223
The Vessel not to be ordered to nor bound to 224
enter: a) any place where fever or epidemics are 225
prevalent or to which the Master, Officers and 226
Crew by law are not bound to follow the Vessel. 227
*Ice* 228
b) any ice-bound place or any place where lights, 229
lightships, marks and buoys are or likely to 230
be withdrawn by reason of ice on the vessel's 231
arrival or where there is risk that ordinarily the 232
Vessel will not be able on account of ice to 233
reach the place or to get out after having com- 234
pleted loading or discharging. The Vessel not to 235
be obliged to force ice. If on account of ice the 236
Master considers it dangerous to remain at the 237
loading or discharging place for fear of the Ves- 238
sel being frozen in and/or damaged he has 239
liberty to sail to a convenient open place and 240
await the Charterers' fresh instructions. 241
Unforeseen detention through any of above cau- 242
ses to be for the Charterer's account. 243

**16. Loss of Vessel** 244
Should the Vessel be lost or missing, hire to 245
cease from the date when she was lost. If the 246
date of loss cannot be ascertained half hire to 247
be paid from the date the Vessel was last re- 248
ported until the calculated date of arrival at the 249
destination. Any hire paid in advance 250
to be adjusted accordingly. 251

**17. Overtime** 252
The Vessel to work day and night if required. 253
The Charterers to refund the Owners their out- 254
lays for all overtime paid to Officers and Crew 255
according to the hours rates and stated in the 256
Vessel's articles. 257

**18. Lien** 258
The Owners to have a lien upon all cargoes, bunkers 259
and sub-freights belonging to the Time-Charterers 260
any Bill of Lading freight for all claims under 261
this Charter, and the Charterers to have not any lien 262
on the Vessel for all moneys paid in advance 263
and not earned. The Charterers will not directly or 264
indirectly suffer, nor permit to be continued, any lien
and/or encumbrance and\or arrests, which might have priority
over the title and interest of the Owners in the Vessel.

**19. Salvage** 265
All salvage and assistance to other vessels to be 266
for the Owners' and the Charterers' equal benefit 267
after deducting the Master's and Crew's propor- 268
tion and all legal and other expenses including 269
hire paid under the Charter for time lost in the 270
salvage, also repairs of damage and coal or oil- 271
fuel consumed. The Charterers to be bound by 272
all measures taken by the Owners in order to 273
secure payment of salvage and fix its amount. 274

**20. Sublet** 275
The Charterers to have the option of subletting 276
the Vessel, subject to the Owners' prior approval
which shall not be unreasonably withheld, upon





III

Case 1:08-cv-05013-UBC-THK Document 14-2 Filed 06/03/2008 Page 4 of 11
THE CHARTER (dated 9th September 2006 (THE PERIOD)
between «Dunsink Trading Ltd» (the Owners) and «Linford Shipping Ltd. » (the Charterers)

giving due notice in writing to the Owners, but the original Charterers always to remain responsible to the Owners for due performance of the Charter and contractors and agents of subcharterers shall be deemed contractors and agents of the Charterers for all the purposes of this Charter. | 277 278 279 280

**21. War**
(A) The Vessel unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or State whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in anyway to any risk or penalties whatsoever consequent upon the imposition of Sanctions, nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by belligerent or fighting powers or parties or by any Goverment or Ruler. | 281–299

(B) Should the Vessel approach or be brought or ordered within such zone or be exposed in any way to the said risks, (1) the Owners to be entitled from time to time to insure their interests in the Vessel and/or hire against any of the risks likely to be involved thereby on such terms as they think fit, the Charterers to make a refund to the Owners of the premium on demand; and (2) notwithstanding the terms of Clause 11 hire to be paid for all time lost including any lost owing to loss of or injury to the Master, Officers, or Crew or to the action of the Crew in refusing to proceed to such zone or to be exposed to such risks. | 300–313

(C) In the event of the wages of the Master , Officers and/or Crew or the cost of provisions and/ or stores for deck and/or engine room and/or insurance premium being increased by reason of or during the existence of any of the matters mentioned in section (A) the amount of any increase to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly. | 314–322

(D) The Vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery, or any other wise whatsoever given by the Government of the nation under whose flag the Vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risks insurance on the Vessel the right to give any such orders or direction. | 323–333

(E) In the event of the nation under whose flag | 334

the Vessel sails becoming involved in war, hostilities, warlike operations, revolution, or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed the Vessel to be re-delivered to the Owners at the ports of destination or, if prevented through the provisions of section (A), from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo on board. | 335–344

(F) If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation. | 345–347
*Section (C) is optional and should be considered deleted unless agreed according to Box 22.* | 348 349

**22. Cancelling**
Should the Vessel not be delivered by the date indicated in Box 23, the Charterers to have the option of cancelling.
If the Vessel cannot be delivered by the cancelling date, the Charterers, if required, to declare within 48 hour after receiving notice thereof whether they cancel or will take delivery of the Vessel. | 350–358

**23. Arbitration (see clause 39)**
~~Any dispute arising under the Charter to be referred to arbitration in London (or such other place as may be agreed according to Box 24) one Arbitrator to be nominated by the Owners and the other by the Charterers, and in case the Arbitrators shall not agree then to the decision of an umpire to be appointed by them, the award of the Arbitrators or the Umpire to be final and binding upon both parties.~~ | 359–368

**24. General Average**
General Average to be **adjusted and settled** in London according to York-Antwerp Rules, 1974.
Hire not to contribute to General Average.
**Adjuster will be appointed by the Owners.** | 369–372

**25. Commission**
The Charterers to pay a commission at the rate stated in Box 25 to the party mentioned in Box 25 on any hire paid under the Charter, but in no case less than is necessary to cover the actual expenses of the Brokers and a reasonable fee for their work. If the full hire is not paid owing to breach of Charter by either of the parties the party liable therefor to indemnify the Brokers against their loss of commission.
Should the parties agree to cancel the Charter, the Charterers to indemnify the Brokers against any loss of commission but in such case the commission not to exceed the brokerage on one year's hire. | 373–387





Case 1:08-cv-05013-SBD Document 42 Filed 06/03/2009 Page 5 of 11
TIME-CHARTER dated 06th September 2006 (MV "VOSKHOD")
between «Dunsink Trading Ltd» (the Owners) and «Linford Shipping Ltd. » (the Charterers)

# RIDER CLAUSES

**Clause 26. Vessel's particulars (all figures are about and without guaranty)**

MV "VOSKHOD"

Pandi covered by Russian P&I Pool.

Hull and Machinery insured by Alpha Strakhovanie with value USD 800.000,-

Type – "Sormovsky", river sea going vessel, singledecker, boxshaped, gearless

| | |
|---|---|
| Flag: | Russian |
| Class: | KM(*)L4[1] I I SP |
| Built: | 1976 |

| | |
|---|---|
| Call sign: | UBKL |
| IMO number: | 7620184 |
| INMARSAT: | 427310465 |

| | |
|---|---|
| Deadweight | 3135 tons |
| Displacement | 4406 tons |
| Grain/bale capacity | 4297,5 m3 |
| GRT/NRT | 2478 / 917 tons |
| Length / beam | 107,5 / 13,00 m |
| L.O.A. | 114.02 m |
| Sea Draft (fully laden) | 3,65 m |
| River Draft/DWCC | 3.4 m/abt.2300 tons |
| | 3.6 m/abt.2500 tons |
| Sea Draft (fully laden)/ Weight carrying capacity | 3,65 m/abt.3000 tons |

4 holds    1) 17,60 x 11,30 x 5,42 m = 952,7 m3
        2) 19,80 x 11,30 x 5,42 m = 1136 m3
        3) 19,80 x 11,30 x 5,42 m = 1146 m3
        4) 18.15 x 11,30 x 5,42 m = 1063,20 m3
4 hatches No.1 - 17,6 x 9,35 m, No.2,3,4 – 18,15 x 9,35 m

Speed at seafull loaded: abt. 8 knots
Speed at sea in ballast    abt. 8 knots
Speed at sea data are relevant for wind force to Beaufort 3 scale.

CONSUPMTION: max 4,0 MT MDO daily steaming
        0,4 MT MDO daily idle (April-October)
        0,6 MT MDO daily idle (October-April)

All figures are about and without guaranty
Vessel is burning Marine Diesel Oil with max 0,5 % sulphur

Vessel has all relevant papers on board and all marks are clearly visible, fore, amidhsip and aft to conduct a proper draft survey.

**Clause 27. Time-charter particulars.**

(a) On vessel's redelivery the Charterers shall perform the last hold cleaning for their account. All and any intermediate hold cleaning will be only for the Charterers account. If assistance of crew for such cleaning will be required, the Charterers should pay USD 300 per every cleaning operation in all holds to the crew as fee for such assistance. The Charterers are to send a written request to the Owners for every cleaning operation.

V

Such fee should be paid with the nearest hire payments. Vessel's delivery/redelivery to be ascertained by a certificates duly signed by Master and Charterers' appointed surveyor or representative.

(b) Delivery/redelivery time for purpose of calculating hire to be based on local (Moscow) time.

(c) Charterers' agent to perform minor Owners' matters at load and discharge ports and at ports of transit. Owners shall reimburse Charterers actual costs (but not agency fee) inclined by Charterers agents from undertaking such minor matters. And In each such case, the Owners are prior to give a written request to Charterers. Owners have options to appoint protective agents. For the purpose of internal Owners' ISM code procedure, the Charterers shall advise to the Owners full stile of agents in ports of loading,discharging and transit agents not later then 1 day prior to arrival .

(d) The Owners have the right to take the vessel out of the service at any time for emergency repairs, and for routine maintenance (including dry-docking) by prior notification to the Charterers.

**Clause 28. Acceptance of delivery and acceptance of redelivery.**

(a) Acceptance of delivery of the Vessel by the Charterers shall not prejudice their rights against the Owners under this Charter.

(b) Acceptance of redelivery of the Vessel by the Owners shall not prejudice their rights against the Charterers under this Charter.

(c) A joint on/offhire survey to be conducted on delivery/redelivery of the vessel. Each party to appoint one surveyor at their own time/expense. Owners have the right to appoint their own master as surveyor.

**Clause 29. Payments (see also clause 6).**

(a) Hire and other payment under this Charter to be made by the Charterers to Owners' nominated account:

> **BENEFICIARY: Dunsink Trading Ltd.**
> **ACCOUNT: 020600P02729560 0000**
> **BENEFICIRY'S BANK: UBS AG, Zurich,Switzerland**
> **SWIFT: UBSWCHZH80V**
> **HIRE PAYMENT DETAILS: m/v «VOSKHOD» time-charter hire _____**
> *(please state period of hire for which this payment is made)*

(b) First payment of hire and value of bunker on delivery to be paid within 3 (three) banking days upon Vessel's delivery.

(c ) First payment of hire to be paid for 15 ( fiveteen) days of hire in advance, to be paid within 3 (three) banking days upon Vessel's delivery, thereafter, every day 30 days in advance.

(d) The Charterers shall pay cables/victualing/Master's entertainment – **USD 200.00** (two hundred) per month along with hire payment. Bunkers (MDO) whilst on hire to be for the Charterers' account.

(e) Hire rate US Dollars 2350,00 net per day and pro rata including over time, luboil and fresh water expenses is to be for Owners account.

(g)The Charterers are not allowed to deduct any expenditures from the hire. All the expenses which are for the Owner's account to be reimbursed to the Chrterers by Owners against a separate invoice issued by Charterers, which is to be settled within 2 banking days after the receipt of invoice in copy by fax or e-mail.

**Clause 30. Bunker clause (see also clause 5).**

(a) Charterers are to bunker the vessel either prior the commencement of the time charter period (upon Owners reconfirmation) or within the period of Time Charter. Price of bunker on delivery will be paid by the Charterers to the Owners at the price of last bunkeringbefore delivery as per respective bunker invoice/bunker receipt ( to be enclosed) in accordance with cl.29(b) of the Present charter. The quantity of bunker remained on board on redelivery will be reimbursed by the Owners at the price of last bunkering by Charterers just upon redelivery as per respective bunker invoice/bunker receipt (to be enclosed).

(b) For the purpose of internal Owners' ISM code procedure, the Charterers shall advise to the Owners full stile of suppliers and agents not later then 2 (two days) days prior to the bunkering/supply of the vessel

VI

which performs for the Charterers account. The bunker and lub-oils shall be of a stable and homogeneous nature and shall comply with ISO standard 8217: 1996 or any subsequent amendments thereof as well as with the relevant provisions of MARPOL. The Chief Engineer shall have rights, including but not limited to checking, verifying and acknowledging sampling, readings or soundings, meters etc. before, during and/or after delivery of the bunker and/or lub-oils. The Chief Engineer, also have the rights to submit the samles of bunker duly sealed and stamped by bunker supply company, during every bunkering, to the laboratory for analysis and the Charterers are liable to pay for such laboratory expenses and send the analysis report to the Owners

(c) The Charterers shall be liable for any loss or damage to the owners caused by the supply of unsuitable bunker and/or lub-oils and the Owners shall not be held liable for any reduction in the Vessel's speed performance and/or increased bunker and/or lub-oils consumption nor for any time lost and any other consequences arising as a result of such supply.

### Clause 31. – Trade limits, cargoes exlusion
(a) T/C VIA SP(s), SB(s), SA, AAAA, AWIWL Azov, Black, Marmara, Ionian, Aegean, Adriatic, Caspian, Baltic, Mediterranean Seas and Russian inland waterway systems as per vessel's class and register documents.

Excluding: all place which are out of abovementioned trade limits, including, but not limited: Lebanon, Libya, Syria, Israel, Turkish Occupied Cyprus, and/or war and\or war-risk zones.

If vessel will be found as blacklisted same to be for Owner's account in case Charterers and/or country and/or cargo are found blacklisted same to be for Charterer's account.

(b) Cargo exclusions specially agreed
Livestock, pitch in bulk, sulphur, fero silicon, nuclear isotopes, H.B.I., cement in bulk, bulk borax, all kind of acid any products associated with direct reduced iron, asphalt, , weapons, arms and ammunitions, creosoted goods, petroleum or its products, petcoke, cakes, pyrites, calcium hydroxide, nuclear materials, expellers, inflammable and dangerous goods, mahogany logs, and other harmful, dangerous, injurious, contraband or any unlawful cargoes. Non IMO cargoes. No cargo allowed for shipment on deck EXCEPT SSW. For the steel scrap cargoes, non oily, no heavy weight no motorblocks, or or turnings - no pressing allowed. Loading, unloading, Lashing, securing dunnage and materials for it for Charterers time and account, always in accordance with vessel description, stability, trim and permissible strenghth/weight, limit drafts.etc. The Charterers must provide the securing materials approved by the Russian Register.

### Clause 32. Charterers' obligations (in addition to any other express and/or implied conditions of this Charter).
(a (b) The Charterers undertake that during the period of this Charter party, they will not procure any supplies or necessaries or services, including any port expenses and bunkers, on the credit of the Owners and/or of the Vessel and that the furnisher claims no marine lien on the Vessel therefore.

(b) The Charterers, their directors, shareholders and beneficiaries shall also be liable to the Owners for any losses, damages, expenses, fines, penalties or claims which the Owners may incur or suffer by reason of the cargo or the documentation relating thereto failing to comply with any relevant laws, regulations, directions of notices of port authorities and/or any other authorities and/or any other breach any conditions and/or warranties by the Charterers.

### Clause 33. Deviation clause.
With the exceptions of clause 11(B) should the vessel unreasonable deviate or put back while on voyage for cause or for purpose for which the Owners' are solely liable the hire shall be suspended from the time of her deviation or putting back until she is again in the same position or an equidistant one to be agreed and voyage to be resumed there from.

**Clause 34. Fumigation clause.**

Fumigation for cargo (if any) take place at port only, all transportation/accommodation/lodging fee to be for Charterers account. Charterers have liberty to fumigate the cargo on board at loading and discharging ports or places en route at their risk and expense. Charterers are responsible for ensuring that Officers and Crew as well as other persons on board the vessel during and after fumigation are not exposed to any health hazards whatsoever. Charterers undertake to pay all necessary extra expenses incurred because of fumigation

**Clause 35. Stevedoring damage.**

(a) Notwithstanding anything contained herein to the contrary, the Charterers shall pay for any and all damage to the Vessel caused by stevedores provided the Master has notified the Charterers and/or their agents and/or stevedores in writing as soon as practical but not later than 24 working hours after any damage is discovered.

(b) In case of any and all damage affecting the Vessel's seaworthiness and/or the safety of the crew and/or affecting the trading capabilities of the Vessel, the Charterers shall immediately arrange for repairs of such damage at their expenses and the Vessel is to remain on hire until such repairs are completed and if required passed by the Vessel's classification society. Any and all other damage shall be repaired as soon as possible at the Charterers' expenses.

**Clause 36. Crew clause.**

(a) Crew to open and close hatches as and when required for stevedores loading and discharging operations provided local regulations allow same. During the currency of this Charter officers and crew will perform the customary services in respect of preparing the vessel for loading/unloading of the cargo in due same diligent manner as and if trading for their Owners' account.

(b) Any delay in connection with smuggling by crew to be for Owners' account.

**Clause 37. Anti-drug and other illegal substances clause.**

(a) The Charterers warrant to exercise the highest degree of care and diligence in preventing narcotic drugs and/or any other illegal substances being loaded or concealed on board the Vessel. Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly. Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire. Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense post bail to secure release of the Vessel. –

(b The Charterers are obliged to keep and care for the cargo at loading and discharging ports; to be responsible for the stevedoring operations; to arrange any transshipment and properly deliver cargoes at destination; to furnish the Master with full and timely instructions; to pay any fines, taxes, charges, expenses, etc. in the event that contraband and/or unmanifested cargoes and/or drugs and/or any other illegal substances found in cargoes.

(c) The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that narcotic drugs and other illegal substances are found in the possession or effects of the Vessel's personnel.

**Clause 38. Supercargo.**

Charterers have the liberty of placing a supercargo onboard. Owners providing him with accommodation. Charterers to pay Owners USD 10,- per day for his victualling. Supercargo to travel under Charterers insurance and under no responsibility for the Owners.

VIII

Case 1:08-cv-05018-GBD Document 9-2 Filed 06/03/2008 Page 9 of 11
«MGBCHARTER documents September deed (6/03/2SKOD»)
between «Dunsink Trading Ltd» (the Owners) and «Linford Shipping Ltd. » (the Charterers)

### Clause 39. Charters, Bills of Lading, Waybills, etc.

*(a) Bills of lading, waybills, etc., will be signed by Master or Charterers' agents for and on behalf of Charterers which are Carriers. Bills of lading, waybills, etc. will be issued only in full accordance with Mate's receipt and the Master to give written authorization to Charterers' Agents for signing of the Bills of the Lading, waybills, etc., and without prejudice to the terms and conditions of this Charter. These are only the name and address of the Charterers (but not of the Owners) as Carriers to be indicated in such documents.*

*(b) Neither the Charterers nor their agents shall permit the issue of any charters, bills of lading, waybills, contract of carriage, etc. incorporating the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any other legislation imposing liabilities in excess of Hague or Hague-Visby Rules.*

( c ) General Clause Paramount, US/Canadian Clause Paramount, as applicable, *the Himalya clause,* The New Both to Blame Collision Clause and the Protection and Indemnity Bunkering Clause shall be deemed to form part of this Charter Party and shall be included in all Bills of Lading issued hereunder. BIMCO Standard War Risk Clause for Time Charters, 1993 (Conwartime 1993), BIMCO Standard ISM Clause - deemed to be incorporated in this Charter Party.

All bills of lading or waybills shall be without prejudice to this Charter Party and the Charterers shall indemnify the Owners against all consequences or liabilities which may arise from any inconsistency between this Charter Party and any bills of lading or waybills signed by the Charterers or by the Master at their request.

Bills of lading covering deck cargo shall be claused: "Shipped on deck at Charterers', Shippers' and Receivers' risk, expense and responsibility, without liability on the part of the Vessel, or her Owners for any loss, damage, expense or delay howsoever caused."

### Clause 40. Off-hire

In the event of loss of time from deficiency and/or default and/or strike of officers or crew, or deficiency of stores, fire, breakdown of, or damages to hull, machinery or equipment, grounding, detention by the arrest of the Vessel, and other causes for which the Owners are solely liable , the payment of hire and overtime, if any, shall cease for the time thereby lost. All bunkers used by the Vessel while off hire shall be for the Owners' account. In the event of the Vessel being driven into port or to anchorage through stress of weather, trading to shallow harbours or to rivers or ports with bars, any detention of the Vessel and/or expenses resulting from such detention shall be for the Charterers' account. If upon the voyage the speed be reduced by defect in, or breakdown of, any part of her hull, machinery or equipment, for whicg the Owners are solely liable the time so lost, and the cost of any extra bunkers consumed in consequence thereof, and reasonable extra proven expenses may not be deducted from the hire, but paid against the separate invoice provided by Charterers.

### Clause 41. Additional Clause

- OWNERS TO GUARANTEE TT VSL WILL NOT BE ARRESTED DUE TO OUTSTANDING PAYMENTS OF THIRD PARTIES INCL DEBTS TO BUNKER SUPPLY COMPANIES

### (a) Grab Discharging

The vessel shall be suitable for normal size grab discharge and Charterers shall not load cargo in places inaccessible to grab discharge. The Charterers shall have the liberty to use bulldozers with rubber tyres in the vessel's holds provided that strength of vessel's tank top permits.

### (b) Hatch Waterproof Test

The Charterers may order a Hose Test or Chalk Test after the delivery of the vessel and from time to time during this Charter, however, Charterers requirement shall not exceed vessel's Class rule. Costs and time of survey to be for Charterers account but the Master to give every facility to the Charterers and their Surveyor to carry out such test

IX

TIME CHARTER dated 16th September 2005 (the «GOOD»)
between  «Dunsink Trading Ltd» (the Owners)  and  «Linford Shipping Ltd. » (the Charterers)

### Clause 42 Arbitration.

(a) In case the Parties do not come to the agreement, all disputes and differences arising out of or in connection with the present Contract, including those relating to its execution, breach, termination or invalidity, shall be referred to the Maritime arbitration commission at the Chamber of Commerce and Industry of the Russian Federation (Moscow, Russian Federation) in accordance with its Regulation and the law of the Russian Federation. The award of the this court shall be final and binding upon both Parties.

### Clause 43. Notices.

Owners to give Charteres 3 and 1 days approximate and 24 hours definite Notices of Delivery. Charteres to give Owners 15 , 7 and 5 days approximate and 3 days and then 2 days and 24 hours definite Notices of Redelivery. Any notices as between the owners and the Charterers shall be in writing and sent to the addresses stated below and such other addresses as either party may designate to the other in writing.

| To the Owners | To the Charterers |
|---|---|
|  | tel/fax   321 12-58<br>chartering@Linfordshipping.com |

### Clause 44. Confidential.

All negotiations and  time-charter contract to be strictly private and confidential.

### Clause 45.

The each Party of the present Charter guarantees to the other party that the Vessel will not be arrested due to outstanding payments, for which such Party is liable.

| Signature (Owners) | Signature (Charterers) |
|---|---|

X

ADDENDUM № 1

TO THE CHARTER PARTY MV "VOSKHOD DATED 06TH SEPTEMBER 2006
BETWEEN "DUNSINK TRADING LTD." AND "LINFORD SHIPPINGS LTD" "

This day it is mutually agreed between Messrs "Linford Shippings Ltd" as
Charterers and Messrs "Dunsink Trading Ltd" as Owners that beginning from 21
November 2006 08:00 the hire is payable 15 days in advance, instead of 30 days.
Other terms and conditions of the C/P mv "VOSKHOD" Dated 06/10/06 to be
unchanged.



For and on behalf of Owners



for and on behalf of Charterers

# МОРСКАЯ АРБИТРАЖНАЯ КОМИССИЯ

### при ТОРГОВО–ПРОМЫШЛЕННОЙ ПАЛАТЕ РОССИЙСКОЙ ФЕДЕРАЦИИ

# РЕШЕНИЕ

по делу № _5/2007 по иску компании «Дансинк Трейдинг Лтд.»_

(Dunsink Trading Ltd.), Роуд Таун, Тортола,
Британские Виргинские острова, к компании
«Линфорд Шиппингс Лтд.» (Linford Shippings Ltd.),
Роуд Таун, Тортола, Британские Виргинские острова,
о взыскании  долл. США  39.825-10

**МОРСКАЯ АРБИТРАЖНАЯ КОМИССИЯ**
при ТОРГОВО-ПРОМЫШЛЕННОЙ ПАЛАТЕ РФ В МОСКВЕ

<u>Дело № 5/2007</u>

«*26*» декабря 2007 г.

Москва

**Р Е Ш Е Н И Е**

по делу по иску компании «Дансинк Трейдинг Лтд.» (Dunsink Trading Ltd.), Роуд Таун, Тортола, Британские Виргинские острова, к компании «Линфорд Шипингс Лтд.» (Linford Shippings Ltd.), Роуд Таун, Тортола, Британские Виргинские острова, о взыскании долл. США 39.825-10.

Морская арбитражная комиссия в составе:

арбитров <u>И.А. Новикова и А.А. Костина</u> при докладчике <u>Н.Н. Остроумове</u> **рассмотрела** в заседании 7 декабря 2007 г.

дело по иску <u>компании «Дансинк Трейдинг Лтд.», Роуд Таун, Тортола, Британские Виргинские острова, к компании «Линфорд Шипингс Лтд.», Роуд Таун, Тортола, Британские Виргинские острова, о взыскании долл. США 39.825-10</u>

**и выслушала** объяснения

Представителя истца: И.А.Фролова (доверенность №17-01 от 15.01.07.).

Представитель ответчика, должным образом извещённого о времени и месте рассмотрения дела, в заседание не явился.

Обстоятельства дела:

6 сентября 2006 г. между компанией «Дансинк Трейдинг Лтд.» (далее – истец) и компанией «Линфорд Шипингс Лтд.» (далее – ответчик) был заключён договор тайм-чартера по проформе «BALTIME 1039» (далее - договор) в отношении судна «Восход» (далее - судно). По договору судно передано ответчику согласно акту приёма-передачи от 7 сентября 2006 г.

По условиям договора и дополнения № 1 от 26 октября 2006 г. к договору ответчик был обязан осуществлять оплату фрахта и представительских расходов капитана судна авансом в размере и в порядке, установленном договором.

2

2.

Однако обязательства по выплате фрахта по договору ответчик, несмотря на неоднократные напоминания истца, исполнял ненадлежащим образом: несвоевременно и не в полном объёме. На момент подачи искового заявления задолженность ответчика по расчётам истца составила долл. США 21.498-10.

В ответ на требования об оплате ответчик представил SWIFT- сообщение, которое рассматривается истцом как сфальсифицированное.

22 декабря 2006 г. истец в связи с неоплатой фрахта изъял судно у ответчика.

18 июля 2007 г. истец, ссылаясь на ст.ст. 310, 363, 395, 634 ГК РФ, ст.ст. 198, 208 КТМ РФ, п. 2 Положения о МАК, п. 3 параграфа 4, п.1 параграфа 6 Регламента МАК, предъявил иск в Морскую арбитражную комиссию, в котором просил Комиссию взыскать с компании «Линфорд Шипингс Лтд.» в свою пользу:

– сумму основного долга в размере долл. США 21.498-10;

– сумму за пользование чужими денежными средствами в размере долл. США 10.162-00, исчисленную исходя из 0,1% за каждый день просрочки платежа;

– расходы на оплату услуг адвоката в размере долл. США 8.165-00.

Итого сумма иска составила долл. США 39.825-10.

Истец внёс аванс арбитражного сбора в сумме долл. США 1.500-00 и просил Комиссию взыскать её с ответчика.

Ответчик исковое заявление получил 24 августа 2007 г. Каких-либо объяснений по иску от ответчика не поступало.

Повестки о слушании дела в МАК 7 декабря 2007 г. по адресу: Москва, ул. Ильинка, д.5/2. были направлены сторонам 23 октября 2007 г. и получены истцом 25 октября 2007 г. и ответчиком 26 октября 2007 г.

Установив, что ответчик был надлежащим образом извещён о времени и месте рассмотрения дела, состав арбитража принял решение о рассмотрении дела в отсутствие представителя ответчика.

**Мотивы решения**

Морская арбитражная комиссия, рассмотрев материалы дела и выслушав объяснения представителя истца, установила следующее.

3

1. Компетенция МАК основывается на п. 2 Положения о Морской арбитражной комиссии, параграфе 1 Регламента Морской арбитражной комиссии и п. 42 договора, заключённого между истцом и ответчиком, согласно которому все споры и разногласия из договора тайм-чартера подлежат разрешению в Морской арбитражной комиссии при ТПП РФ согласно её Регламенту и в соответствии с правом РФ.

2. В силу п. 2 параграфа 11. Регламента МАК неявка стороны, должным образом извещённой о времени и месте заседания, не препятствует проведению заседания, если только до его окончания она не заявила просьбу об отложении разбирательства по уважительной причине. Такого заявления до окончания заседания 7 декабря 2007 г. со стороны ответчика не было. В такой ситуации Комиссия считает правомерным рассмотрение дела в отсутствие представителя ответчика.

3. По условиям договора ответчик был обязан осуществлять оплату фрахта авансом. Договор устанавливал размер и порядок оплаты фрахта. Однако своё обязательство по договору о выплате фрахта ответчик исполнил не в полном объёме. Задолженность ответчика по оплате фрахта составила долл. США 21.498-10, что подтверждается инвойсами и окончательным расчётом судовладельца. Расчёт, представленный истцом, ответчиком не оспорен.

4. Частичная оплата фрахта осуществлялась с нарушением сроков оплаты, установленных договором. истец рассчитал сумму за пользования чужими средствами по всем просроченным платёжным обязательствам ответчика по договору исходя из согласованного с ответчиком размера пени – 0,1 % за каждый день просрочки платежа, ссылаясь при этом на ст. 395 Гражданского кодекса РФ.

Арбитраж не находит данную позицию истца обоснованной как с точки зрения права, так и имеющихся фактов. Как следует из искового заявления и объяснений представителя истца в заседании, 14 января 2006 г. истцом в связи с задержкой первого платежа ответчику было направлено письмо на английском языке, в котором ответчику предоставлялась отсрочка платежа до 19.09.2006г. и предлагалось уплатить "penalty" в размере 0,1% за каждый день просрочки в сумме долл. США 721-44.

В своём электронном письме от 15.09.2006г. ответчик сообщил, что платёж будет осуществлён в надлежащее время, включая сумму "penalty". Как известно, использованное сторонами слово "penalty" в русском языке означает штраф или неустойку. В заседании арбитража представитель истца подтвердил, что платёж был осуществлён вместе с указанной неустойкой. Между тем, в отсутствие в договоре

4.

указаний о неустойке вообще, арбитраж не считает убедительным вывод истца о том, что уплата согласованной неустойки по конкретному платежу должна рассматриваться как внесение в контракт общих положений о неустойке относительно возможных просрочек будущих платежей. Следовательно, требование о взыскании неустойки удовлетворению не подлежит.

5. Истец также ошибочно ссылается на ст. 395 ГК РФ, когда требует взыскания неустойки, так как указанная статья не касается неустоек. Вместе с тем, для обоснования своих требований, основываясь на данной статье, истец должен был бы представить доказательства размера учётной ставки банковского процента в месте нахождения кредитора и соответствующий расчёт, что им сделано не было. В этой связи отсутствуют предпосылки для рассмотрения требования в рамках ст. 395 ГК РФ и оно подлежит оставлению без рассмотрения.

6. Расходы истца на оплату услуг адвоката в размере долл. США 8.165-00 нельзя признать разумными с учётом незначительного объёма и кратких сроков предоставления этих услуг, о чём, в частности, свидетельствует факт совпадения даты подписания договора на оказание этих услуг и даты акта их приемки заказчиком, а также цены иска. С учётом этого арбитраж удовлетворяет данное требование в сумме долл. США 2.000-00.

### Резолютивная часть решения

На основании изложенного, руководствуясь §§ 21, 22 и 23 Регламента Морской арбитражной комиссии, Морская арбитражная комиссия при ТПП РФ

### Р Е Ш И Л А:

1. Обязать ответчика – компанию «Линфорд Шиппингс Лтд.» (Linford Shippings Ltd.), Роуд Таун, Тортола, Британские Виргинские острова, уплатить истцу – компании «Дансинк Трейдинг Лтд.» (Dunsink Trading Ltd.), Роуд Таун, Тортола, Британские Виргинские острова, следующие суммы:

– долл. США 21.498-10 в части взыскания основного долга;
– долл. США 2.000-00 в возмещение расходов истца по ведению дела;
– долл. США 1.042-23 в качестве частичного возмещения расходов истца по уплате аванса арбитражного сбора,

а всего долл. США 24.540-33.

5.

В остальной части иска отказать.

3. В части требования о взыскании долл. США 10.162-00 за пользование чужими денежными средствами иск оставить без рассмотрения.

4. Арбитражный сбор по настоящему делу установить в размере долл. США 1.500-00 и отнести его уплату на стороны пропорционально удовлетворённой и отказанной частям иска, а именно: на ответчика в сумме долл. США 1.042-23 и на истца в сумме долл. США 457-77.

В уплату Морской арбитражной комиссии арбитражного сбора обратить аванс, внесённый истцом при подаче искового заявления.

Настоящее решение составлено и подписано в трёх экземплярах, из которых один предназначен для хранения в делах Морской арбитражной комиссии, один – для истца и один – для ответчика.

Арбитры:

И.А.Новиков                                                    А.А.Костин

Всего прошнуровано, пронумеровано и скреплено печатью

7 ( семь ) листов, включая обложку

Ответственный секретарь
Морской арбитражной комиссии
при Торгово-промышленной палате
Российской Федерации                                          Т.В.Каменская

# MARITIME ARBITRATION COMMISSION
## at the CHAMBER OF COMMERCE AND INDUSTRY
## OF THE RUSSIAN FEDERATION

# AWARD

in the case № 5/2007 on the claim of the company "Dunsink Trading Ltd."
(Dunsink Trading Ltd.), Road Town, Tortola,
British Virgin Islands, against the company
"Linford Shippings Ltd.",
Road Town, Tortola, British Virgin Islands,
for recovery of 39.825-10 US dollars

# MARITIME ARBITRATION COMMISSION
## at the CHAMBER OF COMMERCE AND INDUSTRY OF THE RUSSIAN FEDERATION IN MOSCOW

<u>Case No. 5/2007</u>

Moscow

December 26, 2007

## <u>A W A R D</u>

in the case on the claim of the company "Dunsink Trading Ltd.", Road Town, Tortola, British Virgin Islands, against the company "Linford Shippings Ltd.," Road Town, Tortola, British Virgin Islands, for recovery of 39.825-10 US dollars

The Maritime Arbitration Commission composed of:

I.A.Novikov and A.A.Kostin, arbitrators,

and N.N.Ostroumov, reporter,

**considered** at its meeting of 7 December 2007

the case on the claim of <u>the company "Dunsink Trading Ltd.," Road Town, Tortola, British Virgin Islands, against the company "Linford Shippings Ltd.," Road Town, Tortola, British Virgin Islands, for recovery of 39.825-10 US dollars</u>

and heard the explanations of the

Representative of the Claimant: I.A.Frolov (power of attorney No.17-01 of 15 January 2007).

Representative of the Respondent, duly notified of the time and place of the hearings, did not appear at the meeting.

## Circumstances of the case:

On 6 September 2006 the companies "Dunsink Trading Ltd." (hereafter – the Claimant) and "Linford Shippings Ltd."(hereafter – the Respondent) entered into a time charter contract on the

*9*

"BALTIME 1039" form (hereafter – the Contract) with regard to the vessel "Voskhod" (hereafter – the Vessel). Pursuant to the Contract the Vessel was transferred to the Respondent in accordance with acceptance-transfer certificate of 7 September 2006.

Under the terms of the Contract and Supplement No.1 to the Contract of 26 October 2006, the Respondent was obliged to advance payment of freight charges and of entertainment expenses of the Master of the Vessel in the amount and in manner defined by the Contract.

Nevertheless, notwithstanding repeated reminders by the Claimant, the Respondent fulfilled its obligations under the Contract to pay for the freight improperly: untimely and not in full measure. At the time of filing of the statement of claim the indebtedness of the Respondent by calculations of the Claimant amounted to 21.498-10 US dollars.

In response to the requests for payment the Respondent presented a SWIFT message, which is considered as faked-up by the Claimant.

On 22 December 2006 the Claimant withdrew the Vessel from the Respondent for non-payment of freight.

On 18 July 2006 the Claimant, referring to articles 310, 363, 395 and 634 of the Civil Code of the Russian Federation, articles 198, 208 of the Code of Mercantile Navigation, para.2 of the Statute of the MAC, subpara.3 of para.4, subpara.1 of para.6 of the Rules of the MAC, filed a statement of claim with the Maritime Arbitration Commission, in which he asked the Commission to recover from the company "Linford Shippings Ltd." for its benefit:

- the sum of the main debt in the amount of 21.498-10 US dollars;
- the sum for the use of peculated monetary funds in the amount of 10.162-00 US dollars, calculated on the basis of 0,1% for each day of the delay in payment;
- expenses for lawyer's fees in the amount of 8.165-00 US dollars.

In total, the sum of the claim amounted to 39.825-10 US dollars.

The Claimant paid the arbitration fee in advance in the amount of 1.500-00 US dollars and asked the Commission to recover it from the Respondent.

The Respondent received the statement of claim on 24 August 2007. No explanations concerning the statement of claim were received from the Respondent.

Notifications of the examination of the case in the MAC on 7 December 2007 at the address: 5/2, Ilyinka str., Moscow, were sent to the parties on 23 October 2007 and received by the Claimant on 25 October 2007 and by the Respondent on 26 October 2007.

Having established that the Respondent had been duly notified of the time and place of the examination of the case, the arbitral tribunal decided to examine the case in the absence of the representative of the Respondent.

**Reasons for the award**

The Maritime Arbitration Commission, having examined the materials of the case and having listened to the explanations of the representative of the Claimant, established the following.

1. The jurisdiction of the MAC is based on para.2 of the Statute of the MAC, para.1 of the Rules of the MAC and para.42 of the Contract concluded between the Claimant and the Respondent, according to which all disputes and differences arising out of the time charter Contract shall be settled by the Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation in accordance with its Rules and in conformity with the legislation of the Russian Federation.

2. Pursuant to subpara.2 of para.11 of the Rules of the MAC, failure to appear by a party who was duly notified of the time and place of the meeting shall not prevent the meeting from being held, unless before its completion such party has requested an adjournment for valid reasons. Such a request has not been made by the Respondent before completion of the meeting on 7 December 2007. In such a situation, the Commission considers it justified to examine the case in the absence of the Respondent.

3. Under the terms of the Contract the Respondent was obliged to effect payment of freight in advance. The Contract defined the amount and manner of payment of the freight. Nevertheless, the Respondent did not fulfill its obligation under the Contract to pay for the freight in full measure. The indebtedness of the Respondent for the freight amounted to 21.498-10 US dollars, which is proved by the invoices and by the final payment to the ship-owner. The payment, presented by the Claimant, was not called in question by the Respondent.

4. Partial payment of freight charges was being made with violations of time limits set by the Contract. The Claimant calculated the sum for the use of peculated monetary funds under all past due liability payment obligations of the Respondent on the basis of the amount of penalty agreed with the Respondent - 0,1 % for each day of the delay in payment, referring herewith to art.395 of the Civil Code of the Russian Federation.

The Arbitral tribunal does not find this position well-grounded from the point of view of law, as well as of the existing facts. As it follows from the statement of claim and from the explanations given by the representative of the Claimant in the course of the hearings, on 14 January 2006, following the delay in first payment, the Claimant sent a letter to the Respondent in English language, in which he allowed the Respondent to defer payment until 19 September 2006 and proposed it to pay a "penalty" in the amount of 0.1% for each day of the delay amounting to 721-44 US dollars.

In its electronic message of 15 September 2006 the Respondent informed the Claimant that the payment would be made in due time, including the sum of the "penalty". As it is known, the

world "penalty" used by the parties means "fine" or "forfeit" in Russian language. In the course of the hearings, the representative of the Claimant confirmed that the payment had been made together with the above-mentioned forfeit. Meanwhile, in the absence of any reference to forfeit in the Contract, the Arbitral tribunal does not consider persuasive the conclusion of the Claimant that the payment of the agreed forfeit in connection with the specific settlement has to be considered as the inclusion in the Contract of general terms concerning forfeits for possible delays in future payments. Hence, the request for the recovery of penalty is to be dismissed.

5. The Claimant also erroneously refers to art.395 of the Civil Code of the Russian Federation when it requests the recovery of a penalty, because this article does not apply to penalties. At the same time, in order to justify its claims on the grounds of this article, the Claimant should have presented proof of the bank interest rate effective at the place of location of the creditor and of the corresponding settlement, which was not made by the Claimant. In this connection, there are no prerequisites for the examination of the request in the framework of art.395 of the Civil Code of the Russian Federation, and this claim has to be shelved.

6. The Claimant's expenses for the lawyer's fees in the amount of 8.165-00 US dollars cannot be considered reasonable taking into account the insignificant amount thereof and short time period during which they were provided, which is, *inter alia,* attested by the fact that the date of signing of a contract for the provision of these services and the date of the certificate of their acceptance by the Claimant coincide, as well as the amount of the claim. Taking this into account, the arbitral tribunal satisfies this claim in the amount of 2.000-00 US dollars.

## Operative part of the award

In view of the aforesaid, following §§ 21, 22 and 23 of the Rules of the MAC, the Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation

DECIDED:

1. To oblige the Respondent – the company "Linford Shippings Ltd.", Road Town, Tortola, British Virgin Islands, – to pay to the Claimant – the company "Dunsink Trading Ltd.", Road Town, Tortola, British Virgin Islands, – the following sums:

   - 21.498-10 US dollars in part concerning the recovery of the main debt;

   - 2.000-00 US dollars in compensation of the expenses of the Claimant in the present case;

   - 1.042-23 US dollars as partial reimbursement of the expenses of the Claimant for the payment of the arbitration fee in advance,

   that is 24.540-33 US dollars in total.

To dismiss the rest of the statement of claim.

3. To shelve the statement of claim in part concerning the recovery of 10.162-00 US dollars for the use of peculated monetary funds.

4. To set the arbitration fee for the examination of the present case at 1.500-00 US dollars and to apportion it between the parties according to the satisfied and to the dismissed parts of the claim, specifically: 1.042-23 US dollars shall be borne by the Respondent and 457-77 US dollars shall be borne by the Claimant.

To count the sum paid in advance by the Claimant at the time of filing its statement of claim in the payment of the arbitration fee due to the Maritime Arbitration Commission.

The present award is composed and signed in triplicate, one copy being designed for storing in the archives of the Maritime Arbitration Commission, one – for the Claimant and one – for the Respondent.

Arbitrators:

I.A.Novikov  [signature]                    A.A.Kostin [signature]

Seal: Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation, Moscow.

Bound, numbered and sealed
7 (seven) pages, including cover

Executive secretary of
Maritime Arbitration Commission
At the Chamber of the Commerce and Industry
Of the Russian Federation, Moscow
[signature] T.V.Kamenskaya

[seal]: Maritime Arbitration Commission at the Chamber of Commerce and Industry of the Russian Federation, Moscow

Текст документа переведен с русского языка на английский язык переводчиком **КАДАГИДЗЕ ДАВИДОМ ЛЕВАНОВИЧЕМ.**

*Город Москва.*

*Двадцать третьего мая две тысячи восьмого года.*

Я, Савельев Александр Евгеньевич, нотариус г. Москвы, свидетельствую подлинность подписи, сделанной переводчиком **КАДАГИДЗЕ ДАВИДОМ ЛЕВАНОВИЧЕМ** в моем присутствии. Личность его установлена.

Зарегистрировано в реестре за № *3-9495*

Взыскано по тарифу: 100 рублей; за услуги: 400 рублей

Нотариус

**Итого прошнуровано, пронумеровано и скреплено печатью 13 (Тринадцать) листов.**
**Нотариус**